## Hopkins et al., Appellants, *v.* Women's Medical College of Pennsylvania.

Argued April 22, 1938. Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*Daniel C. Donoghue,* for appellants.

*Walter Lee Sheppard,* for appellee.

OPINION BY MR. JUSTICE STERN, June 17, 1938:

In 1920 Women's Medical College of Pennsylvania, respondent, conducted a campaign to raise funds for its support. Included in the advertising matter which it then distributed was a bulletin entitled "Campaign Number," containing the statement: "Five thousand dollars will endow a Scholarship." Petitioners are members of the Alliance of Catholic Women of the Archdiocese of Philadelphia, an unincorporated association, which contributed $5,000 to respondent during the campaign.* The terms of the gift were agreed upon in correspondence which shortly thereafter passed between respondent and the Archbishop of Philadelphia. The latter wrote to the President of the College: "I have been informed that the Alliance of Catholic Women have founded a scholarship in your Medical College to be known as the Julia P. Harton Memorial Scholarship. . . . This Julia P. Harton Memorial Scholarship is intended for the education in your College of a Catholic student, preferably of this Diocese of Philadelphia, to be named by the Alliance Scholarship Committee." The College replied by a letter from its secretary: "The Board of Corporators of the Women's Medical College of Pennsylvania . . . desires me to send you their thanks for the gift of a Scholarship in the College—to be

---

* Petitioners are acting in these proceedings for themselves and on behalf of all the members of the Alliance.

known as the Julia P. Harton Memorial Scholarship. The following resolution was adopted—Resolved that we approve the terms of the gift of the Julia P. Harton Memorial Scholarship, and that we take up by correspondence the supplementary terms—concerning—subject to the contingency of the Committee's failure to appoint a candidate—by the first of September. May I ask you to convey this to your Committee and to say the Medical College reserves the right, in all scholarships—to award the Scholarship to a candidate on the waiting list provided no applicant has been named by the organization, by whom the Scholarship is founded—by September 1st of any year." A letter followed, written on behalf of the Archbishop, to respondent's secretary: "I offer the following paragraphs—to be added as 'supplementary terms'—under which the Scholarship is given. Should the Committee representing the Alliance of Catholic Women fail after being advised of a vacancy to award the Julia P. Harton Memorial Scholarship to a fully qualified candidate by September 1st of any year —the Board of Corporators may award the Scholarship to a candidate applying to the College office, provided— such candidate is a member of the Catholic Church, and shall secure endorsement of her application from the above Committee. If no student can be obtained under the above conditions, for any one year—the interest for that year,—on the Scholarship Fund shall be allowed to accrue and be added to the principal." In reply, respondent's secretary wrote that it agreed to accept these supplementary terms. Subsequently the Board of Corporators of the College, at a meeting, formally voted such acceptance, and stated that "The Julia P. Harton Memorial Scholarship is for the education in the Women's Medical College of Pennsylvania of a Catholic student, preferably of this diocese of Philadelphia, to. be named by the Alliance Scholarship Committee."

From July, 1920, for a period of fifteen years, respondent annually granted the scholarship to the stu-

dent named by the Alliance Scholarship Committee, but with the college year commencing in September, 1935, it refused to make such grant on the ground of a lack of income in the fund necessary to support it. When the agreement as to the scholarship was first made the annual tuition fees for a student in the College were $175, but in 1921 they were raised to $200, in 1922 to $250, in 1926 to $300, in 1929 to $350, in 1930 to $375, and in 1932 to $400. Because of this increase, and also because of the diminution in income resulting from the economic depression, the returns from the fund were no longer adequate to pay for the annual tuition of a student.

The present proceeding is for a declaratory judgment to determine the rights and obligations of the parties. It is the contention of petitioners that the arrangement between the parties amounted to a binding contract, by which respondent, for the $5,000 which it received, agreed to furnish tuition annually, during the term of existence of the College and without additional charge, to a student nominated by the Alliance Scholarship Committee. It is the contention of respondent, on the other hand, that its obligation was merely to administer the scholarship fund as a trust, and to apply the net income, so far as available, toward the tuition fees of the holder of the scholarship; if not enough to pay the full annual charge, income should be allowed to accumulate until sufficient to cover a student's fees for one year.

We cannot agree with the decision of the court below supporting the construction of the agreement urged by respondent. If the intention of the parties had been that the College was obligated merely to apply the income from the $5,000 as far as it would go toward defraying the annual tuition charge, there would have been no purpose in advertising that "$5,000 will endow a Scholarship," nor any reason for naming any sum whatever in that connection. What petitioners sought to obtain, and what they were justified from the correspondence in believing they had obtained, was an assurance

that the nominee of their committee would be accepted each year by the College as a student without further charge. The risk attendant upon the giving of such an assurance and of entering into such a contractual obligation was presumably weighed and assumed by respondent. If conditions subsequently demonstrated that the College, in its natural eagerness to secure substantial contributions, had made an unwise bargain, that, of course, would not relieve it from performance. Had the annual tuition fee remained at $175 there would have been ample, and indeed surplus, income from which the annual award of the scholarship could be made. If respondent's viewpoint were to be upheld, the raising of the tuition rates would be permitted to defeat the entire object of petitioners by making their gift hopelessly inadequate for the purpose for which, in good faith, it had been contributed.

The only precedents in Pennsylvania throwing any light upon the present situation are *Houston v. Jefferson College,* 63 Pa. 428, and *Alumnæ Association of William Penn High School for Girls v. University of Pennsylvania,* 306 Pa. 283. Neither of them is directly in point, but their language accords with the conclusion here reached. In the *Jefferson College* case it was stated (p. 429) that "the trustees put into operation a plan of endowment, whereby on the payment of $25 or $50 or $100 a subscriber became entitled to a single scholarship, a family scholarship, or tuition for thirty years, respectively; by the payment of $400, a perpetual scholarship was endowed to be designated as the subscriber chose and the scholarship might be disposed of by sale or bequest; and by payment of $1,250, the subscriber became owner of a scholarship, entitling the holder to the tuition, room rent and boarding of one student in perpetuity." Of these scholarships the court said (p. 438) : "They are contracts for tuition in consideration of a prepaid subscription, and are to be interpreted as ordinary contracts." In the *University of Pennsylvania* case the

Medico-Chirurgical Hospital (predecessor of the University qua this transaction) stated to a High School Alumnæ Association that it would accept from them the endowment of a bed in a private room of the hospital, and would grant the privilege of allowing any member of the Association who might at any time require hospital treatment the use of this bed with medical attendance and nursing. The Association was to pay the sum of $5,000. The Hospital put a brass tablet on the door of the room stating that the bed was endowed by the Association. The terms of the endowment were found to be extremely unprofitable and the University sought the right to return the fund to the Association and to be relieved of its obligation. The court said (pp. 278, 288): "Defendant hospital authorities . . . accepted the endowment and have for sixteen years continuously carried out the terms of the contract without question. They cannot now be permitted to repudiate it. . . . The acceptance of the endowment and of the terms under which it was given constitute a covenant for the duration of the existence of the donee hospital and its successors."

In our opinion, there is no inconsistency, from a legal standpoint, between an obligation of respondent to administer a scholarship fund as a trust, segregated from its other assets, and an accompanying contractual obligation to give tuition to a student each year whether the income from the fund is or is not sufficient for that purpose.

The decree of the court below is reversed, and the record is remitted with directions to enter a decree to the effect that a valid contract exists between the Alliance of Catholic Women of the Archdiocese of Philadelphia and the Women's Medical College of Pennsylvania obligating the College, so long as it exists, to grant tuition therein annually, without additional compensation, and irrespective of the amount of income obtained from the $5,000 trust fund, to the student named by the Alliance

Scholarship Committee, such student being qualified in all other respects to receive such scholarship, in accordance with the terms and conditions specified in the correspondence between the parties. Costs to be paid by respondent.

Mr. Chief Justice KEPHART did not participate in the decision.